## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **PAULA TAYLOR-LYNCH**<br>1638 27th Street, SE<br>Washington, DC 20020 | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. _____ |
| v. | ) | |
| | ) | |
| **R. ALEXANDER COSTA**<br>Secretary of Labor<br>U.S. Department of Labor<br>200 Constitution Ave NW<br>Washington, DC 20210, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT
(Employment Discrimination)

## INTRODUCTION

1.      Plaintiff, Paula Taylor-Lynch, brings this action to redress unlawful employment

discrimination and retaliation perpetrated against her by the United States Department of Labor

in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2003e, *et seq.*,

and the Rehabilitation Act of 1973 as amended, 29 U.S.C. §§ 701, *et seq.*, when her Department

of Labor managers discriminated against her based upon her race, color, national origin, and

disabilities and then retaliated against her because she opposed the discrimination base on race,

color and national origin, and complained about the failure to accommodate her known

disabilities.

**JURISDICTION**

2.      This Court has jurisdiction over the subject matter of this civil action pursuant to

Title VII of the Civil Rights Act of 1964,  as amended, 42 U.S.C.§ 2003e, and the Rehabilitation

Act of 1973 as amended, 29 U.S.C. §§ 701.  Subject matter jurisdiction is also pursuant to 28

U.S.C. § 1331, as this action arises under the laws of the United States, thereby presenting a

federal question.

**VENUE**

3.      Venue is proper in the United States District Court for the District of Columbia

pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred, and

the Defendant is located, has offices, and conducts business in this District, and Plaintiff was

assigned to work in this District.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

4.      All of the necessary administrative prerequisites for filing the above-referenced

claims have been met, as more than 180 days have elapsed since Plaintiff filed administrative

complaints of discrimination (DOL-15-11-107, filed July 16, 2015 and  DOL-17-11-075, filed

April 19, 2017) with the agency addressing the matters raised in this civil action.  A Final

Agency Decision was received on complaint number DOL-17-11-075 on October 23, 2018.

However, a Final Agency decision has not been received on DOL-15-11-107.

**PARTIES**

5.      Plaintiff Paula Taylor-Lynch is a GS-14 Senior Government Information

Specialist.  At all times relevant to this complaint she has been employed by the DOL's

Employment and Training Administration (ETA).

6.      Defendant R. Alexander Acosta is the Secretary of Labor and head of United States Department of Labor.  Mr. Acosta is named as Defendant in this action in his official capacity as head of the Department of Labor.

## STATEMENT OF FACTS

7.       Paula Taylor-Lynch was born on February 27, 1967.  Her paternal grandmother is Blackfoot Indian.  Her paternal grandfather is Caucasian.   Her maternal grandmother is African American.  Her maternal grandfather is also Blackfoot Indian.  Her skin color is light brown.  As the result of a injuries sustained at work, she has been diagnosed as suffering from post-concussion syndrome resulting in severe neuro-cognitive impairment including headaches, dizziness, difficulty concentrating, changes of vision, difficulty sleeping, moderate depressive symptomology and clinically elevated levels of anxiety.  In addition she has various orthopaedic injuries that limit her ability to walk for more than short distances.  These impairments also limit her ability to work in a hectic work environment.

8.      Plaintiff began her federal service in October 2008 as a GS-11 FOIA Specialist. Over the years she was promoted to be a GS-14 Senior Government Information Specialist. As a GS-14 Senior Government Information Specialist, Plaintiff has in the ETA served as the agency expert to address issues related to the agency's obligations under the Freedom of Information Act (FOIA), Privacy Act (PA), and related issues.  As such, she provided technical guidance, advice and assistance to managers and staff throughout the Agency.  It was part of her job to oversee the FOIA work in ETA HQ organizations, and ETA Field organizations.  Her duties included establishing and maintaining a consistent and a comprehensive program to ensure ETA compliance with the Freedom of Information Act and related requirements.

9.      In May 2011, Yvonne Sims, a dark-skinned African American, was assigned as the Director of the Office of Administrative Services and as such became Plaintiff's supervisor. Plaintiff's second-level supervisor was Lisa Lahrman, the Administrator for the ETA Office of Management and Administration Services. Ms. Sims had little knowledge about FOIA so for a time  she did not trouble Plaintiff. However, Ms. Sims was very harsh with other staff members and forced them to leave.  For example, she forced two older white males to leave the office by interfering with their work and making it difficult for them to do their job.  She also forced another older white male to retire under a threat of termination.  She also caused the termination of another ETA employee by denying the employee the right to telework (so that she could address family matters), thereby causing T& A issues.

10.      In 2013, because of Plaintiff's supervisory and managerial responsibilities as the ETA FOIA Manager, ETA management designated Plaintiff as a recognized as a Professional Government Supervisor, which qualified her to receive a bonus und the fiscal year 2013 management bonus plan.  In March 2014, Plaintiff was awarded a management bonus plan and was congratulated by her supervisor for having earned it. In July 2014, Ms. Lahrman and Ms. Sims sent Ms. Lynch to Professional Government Supervisor training, which Plaintiff was required to complete within one year of her designation as a Professional Government Supervisor.  However, when Plaintiff complained about Ms. Sims' abusive treatment, despite the fact that she had complete the required training and received the prior's years bonus, she was informed that her bonus was being reduced.  Ms. Sims became angry that Plaintiff did not remain subservient, confronted her about the pay cut, and said words to effect that Plaintiff should be grateful for everything that Ms. Sims has done for her.

11.     Ms. Sims became very abusive toward Plaintiff in 2014.  Based upon Ms. Sims' treatment of others in the office, Ms. Taylor-Lynch was afraid of Ms.Sims and fearful that she would cause Plaintiff to lose her job. As time went on, Ms. Sims' comments and emails revealed her bias against Plaintiff because of her skin color and Native American heritage.  Ms. Sims referred to Plaintiff as a "slave" who should be working in the "field," "house nigger," and "half-breed."  While Ms. Sims typically cast these remarks as a form of humor, Plaintiff was deeply offended by remarks of this nature.  However, because Ms. Sims was a very intimidating supervisor, as shown below, Plaintiff played along with her epithets. In addition to the oral comments, Ms. Sims sent emails using these offensive terms which can be described as follows:

a.     **October 24, 2014,** Ms. Sims sent Plaintiff an email in which she stated "☺ Get to work, Slave! Ha .. ha .. ha"

b.     **December 4, 2014,** Plaintiff had the following email exchange with Ms. Sims:

> **Sims:**  Good Morning  I just love my staff:)
>
> **Plaintiff:** We love you tool!  LOL... back to the fields I go!!
>
> **Sims:**  You forgot to say "yes sa Massah>" LOL
>
> **Plaintiff:**     Do'n go yet, bawsss (boss) l's yet gotta get to gettin' LMFAO
>
> **Sims:**  Now I am hollering! Just love my staff. We have way too much fun!
>
> **Plaintiff:**     Tooo too much. LOL We couldn't survive the stress and weight of this responsibility without it. Shelia wants to get started, but I am telling her to give me until the10th  have to chorale all the folks that don't remember FOIA related training.., did you see those regional responses? 0MG

c.     **On December 9, 2014,** Ms. Sims sent Plaintiff an email in which she stated "Waa...Waa...Waaa Stop eating and work, slave! LOL"

d.   **Again, on December 9, 2014,** Plaintiff had the following email exchange with Ms. Sims:

**Plaintiff :**   Who am I kidding? I don't have time for a break... l am a slave!!

**Sims:**  Yes, I knew you would see it my way. Good slave!! LOL

d.   **December 11, 2014,** I had the following email exchange with Ms. Sims:

**Plaintiff :**   Taking a break

**Sims:**  No Slave!

**Plaintiff :**   LOL Please… dizzy. Gotta eat. LOL LOL

**Sims:**  Two sips of water and one crumb of bread.

e.   **On December 12, 2014**, When Plaintiff raised issues about the complexity of the FOIA work, Ms. Sims sent her an email in which she stated: "I will send it out then my slave "pigeon." LOL☺"

f.   **Again, on December 12, 2014,** Ms. Sims sent Plaintiff an email in which she stated: "Hmmmnnn ... that will be 30 more lashes to six extra hours in the field!! Oh yeah ... no food for two days!!!"

12.   On January 13, 2015, Ms. Sims sent an email to Andrea Hill suggesting that she was a "slave" and making light of the fact that Andrea Hill had taken time off to care for her mother.  Apparently, because Ms. Sims had sent a copy of the email to Plaintiff, Andrea Hill called Plaintiff  that evening crying about the email and what it said.

13.   That same evening, Plaintiff called her second-level supervisor and Ms. Sims' direct supervisor, Lisa Lahrman, and told her what had happened.  Ms. Lahrman, the Administrator for the Office of Management and Administration Services, told Plaintiff to speak with Andrea Hill's manager, who was Laura Watson.  The next morning, Plaintiff went to Ms. Watson and told her what had happened and showed her the mail.  After that, Plaintiff went with

Ms. Watson to a meeting with Ms. Watson, Crystal Kelly (ETA HR) and Lisa Lahrman.  In that meeting, Plaintiff confirmed that Ms. Sims had sent the email to Andrea Hill and that Plaintiff had spoken with Andrea Hill who was very upset.  Plaintiff also stated that Ms. Sims had sent similar emails to her.  At this point, Ms. Watson was very upset and told Ms. Lahrman, "You can't keep allowing this."  She then left the room.  Plaintiff had her cell phone with her and searched her emails for the word "slave" and showed Ms. Lahrman and Ms. Kelly some of the emails that Ms. Sims had sent to Plaintiff.

14.     On the way to the meeting, Ms. Watson had told Plaintiff that she should ask for whistleblower protection.  Plaintiff  did not know what whistleblower protection meant, so during the meeting she asked Ms. Lahrman to protect her from retaliation by Ms. Sims.  Ms. Lahrman assured Plaintiff that she would be protected.  However, in previous conversations, Ms. Lahrman had warned Plaintiff not to complain about Ms. Sims, stating that she had worked with Ms. Sims in a number of previous assignments and that when someone crossed Ms. Sims, she would intensify the abusive behavior.  Ms. Lahrman issued an oral reprimand to Ms. Sims but did not follow through with her promise to protect Plaintiff .

15.     Shortly after the meeting with Ms. Watson, Ms. Lahrman told Plaintiff that she had "dealt with Yvonne [Sims]."  However, she did little to reassure Plaintiff that Ms. Sims would not retaliate.  Instead, she told Plaintiff to "fight the feeling," which was something she had previously said when Plaintiff spoke to her about the abusive treatment she had received from Ms. Sims, but Ms. Lahrman left Plaintiff under Ms. Sims's supervision.

16.     Although Ms. Sims discontinued the racial comments, she intensified her abusive treatment.  This included a nasty exchange of email in which Ms. Sims tried to blame Plaintiff for an unauthorized software purchase with paid training for the software. In addition, Ms. Sims

falsely accused Plaintiff of refusing to provide training to Janice Sheelor, a detailee who had

been brought in to help with the FOIA work.  In addition, Ms. Sims tried to make it appear that

Plaintiff was not performing by crediting Ms. Sheelor for work that Plaintiff actually had done.

Ms. Sims continued to give Plaintiff unreasonable deadlines, and would delay forwarding work

Plaintiff had timely accomplished to Ms. Lahrman and other management officials.  Ms. Sims

also tried to hide how she was treating Plaintiff, by directing Plaintiff to respond to only her

when she emailed Plaintiff, even when Ms. Sims had sent the initial email to multiple recipients.

17.     On March 16, 2015, Ms. Sims withheld notice of a requirement to provide a

summary to Ms. Lahrman for a scheduled presentation until 30 minutes before the presentation.

This forced Plaintiff to scramble to deliver the summary to Ms. Lahrman.  As Plaintiff ran down

the hallway to deliver the summary, she fell and was seriously injured.  Although Plaintiff was in

obvious pain and was crying, Ms. Sims ridiculed Plaintiff, by telling her that she (Sims) was

video-recording Plaintiff and would post the video on social media.

18.     As the FOIA Coordinator, Plaintiff was assigned to give a brown bag FOIA

training, three days after the fall.  Despite the fact that Plaintiff was disabled due to multiple

injuries sustained when she fell, Ms. Sims instructed Plaintiff to have her husband take leave and

"wheel" her in for the training. Plaintiff therefore went to Ms. Lahrman and told her that she was

being forced to give training despite the fact she was not able to do so due the her injuries.

19.     Following her injury, Plaintiff, who prior to her injury had been teleworking three

days a week, sought a reasonable accommodation in the form of light duty, which pursuant to

her doctor's recommendation meant working from home 5 days a week for about six weeks.  On

March 30, 2017, Plaintiff provided a note from her doctor to Ms. Sims which indicated that

Plaintiff could "return to light duty (tele work from home ) on 03/30/2015" and "recommended

her to be on light duty while on medical treatment and physical therapy for 6 weeks." In addition, Plaintiff informed Ms. Sims that due to the medication she was taking, she could not safely drive a car. Rather than allow her this necessary accommodation, Ms. Sims forced her to apply to work home via the Agency Alternative Work Schedule Program. Ms. Sims then made up a rule that Plaintiff could not work from on home on consecutive days and refused to approve Plaintiff's AWS request. Ms. Sims then refused to approve Plaintiff's re-submission, which was fully compliant with the ad hoc, undocumented, new rule, which delayed approval of Plaintiff' accommodation.

20.     By early April 2015, Plaintiff became concerned that Ms. Sims, in collaboration with ETA's HR manager, Crystal Kelly, was interfering with her Worker's Compensation claim thereby preventing the claim from being timely processed by the Office of Worker's Compensation Programs (OWCP). When she inquired about the processing of her Worker's Compensation claim and her doctor's light duty order, Ms. Kelly and Ms. Sims accused Plaintiff of "attempting to formalize" a claim "blaming" her supervisors per Ms. Kelly's email response to Plaintiff's first request for assistance with light duty job offer. Plaintiff sought assistance from the Office of Worker Safety to explain to Ms. Sims the non-adversarial process applicable to a claim for workers compensation. Ms. Sims indicated that she was in contact with OWCP but worked with HR to obstruct Plaintiff's Worker's Compensation Claim.

21.     Rather than promptly forward Plaintiff's medical information to OWCP, Ms. Kelly's assistant, Karen Henderson, misled Plaintiff's Doctor (Dr. Sener) by making inquires leading him to believe that they were from OWCP and thereby delayed approval of Plaintiff's Worker's Compensation claim. As a result of the delays in providing medical information to OWCP, treatment of Plaintiff for her post-concussion injuries was delayed until May 2015. This

delay resulted in both a delay in her recovery and an exacerbation of her injury due to the nontreatment.

23.     After repeated denial of Plaintiff's requests for light duty, Plaintiff requested reasonable accommodations on April 10, 2015, but got no relief until she was transferred effective April 20, 2015.  Ms. Sims falsely claimed she needed "updated medical" documents, before Ms. Lahrman shifted responsibility to the new manager.  Plaintiff's request for reasonable accommodation was delayed for months due to Ms. Sims' obstruction.

24.     Plaintiff was worn out and distraught by Ms. Sims' unreasonable, repeated instructions to return to the office, dismissal of medical requests for total telework, abuse and deception regarding her AWS requests.  Therefore, Plaintiff asked to be moved from under Ms. Sims' supervision. Plaintiff did not request that she be relieved of her duties as the ETA's expert Government Information Specialist for FOIA and Privacy – indeed, she could have performed these duties with a different supervisor.  On April 16, 2015, Ms. Lahrman called Plaintiff into the office and admonished her for "sending emails" complaining about Ms. Sims.  Ms. Lahrman refused to take steps protect Plaintiff from the hostile environment created by Ms. Sims, and instead transferred Plaintiff to a different position at the ETA Office of Foreign Labor Certification effectively demoting her from her management duties.  Rather than approving the light duty assignment that was recommended by Plaintiff's doctor and necessary before it could be approved by OWCP, Plaintiff was transferred  to a lower-level, more complex position, without a position description.

25.     Plaintiff was troubled that her Senior Government Information Specialist position was taken away, but relieved to be with a group of people where she was appreciated and not abused.  However, her peace ended in June 2016, when Ms. Lahrman assigned Ms. Sims' friend,

Peni Webster-Lewis, as the Acting Director of the ETA Office of Foreign Labor Certification. In collaboration with Ms. Sims and as Plaintiff's supervisor, Ms. Webster-Lewis began to abuse Plaintiff within months of her return to full time hours in her light duty position.  While serving under Ms. Webster-Lewis's supervision, the abuse of Plaintiff included, but was not limited to:

(a) On October 19, 2016, Plaintiff was subjected to intimidation, hostile scowling, insults and yelling from a co-worker;

(b) On November 3, 2016, a management official did not take action after Plaintiff reported a "street level confrontation" with a co-worker that involved yelling, intimidation, a breach of Plaintiff's privacy and mocking her disability;

(c) During the period  December 12-14, 2016, Plaintiff was subjected to physical intimidation, a verbal threat and intimidation by a co-worker;

(d) On December 14, 2016, Plaintiff was subjected to ridicule of her disability, loud ranting and scorn from co-workers;

(e) During the period January 10-12, 2017, a management official "obstructed" Plaintiff's job performance and ability to provide deliverables;

(f) On March 15, 2017 a management official breached the confidentiality of an EEO matter in which Plaintiff was involved;

(g) From March 27, 2017 until May 2017, a management official worked with the offices of Human Resources and Labor Management Relations to alter Plaintiff official status;

(h) On May 19, 2017 Plaintiff was reassigned to the position of Grant Management Specialist;

(i) Although Plaintiff received a rating of "Exemplary" for Fiscal Year 2017 on October 27, 2017, Plaintiff did not receive a bonus;

-11-

(j) On November 14, 2017, Plaintiff learned that the Agency submitted false information to the Office of Workers Compensation Programs (OWCP) on September 14, 2017, in which it falsely claimed that Plaintiff had been reassigned to a position that was the same as the one outlined in her position description, when it was in fact different in title, series, and expertise required; there was also the false claim that the agency had not granted Plaintiff any reasonable accommodation based on her stress, when in fact, she had been granted full time telework as a reasonable accommodation;

(k) On November 15, 2017, Plaintiff learned that on March 18, 2015, the Agency provided OWCP with an incomplete description of her March 16, 2015, workplace injury by omitting any reference to a head impact, thereby prolonging the date on which Plaintiff was able to obtain proper treatment for her injuries; and

(l) The Agency failed to pay its share of Plaintiff's healthcare benefits from Pay Periods 17-21 in FY 2017.

## STATEMENT OF CLAIM

**Count I.**       **Discrimination Based upon Race, Color and National Origin**

26.       By ridiculing Plaintiff because of her race, color and national origin,  subjecting her to abusive treatment in the workplace, interfering with her claims for worker's compensation benefits, demoting her from her Senior Government Information Specialist position and placing her in positions which were less suitable for her given her knowledge, skills and abilities, Defendant has engaged in unlawful employment discrimination against Plaintiff Ms. Taylor-Lynch based upon her race, color and national origin.

27.       As a result of this unlawful discrimination, Plaintiff has suffered and continues to suffer adverse consequences, including loss of pay and benefits of such employment, career

damage, personal and professional embarrassment and humiliation, both delayed healing and an exacerbation of her medical condition, physical and emotional pain and suffering, and a loss of the enjoyment of life.

**Count II.      Retaliation for Protected Activity**

28.      By subjecting Plaintiff to ridicule and abusive treatment in the workplace, interfering with her claims for worker's compensation benefits, demoting her from her Senior Government Information Specialist position and placing her in positions that were less suitable for her given her knowledge, skills and abilities, Defendant unlawfully retaliated against her because of her prior protected activity of opposing race, color, and national origin discrimination and seeking accommodation for her disability. As a result of this unlawful discrimination, Plaintiff has suffered and continues to suffer adverse consequences, including loss of pay and benefits of such employment, career damage, personal and professional embarrassment and humiliation, both delayed healing and an exacerbation of her medical condition, physical and emotional pain and suffering, and a loss of the enjoyment of life.

**Count III.      Discrimination Based Upon Disability.**

29.      By ridiculing Plaintiff because of her disabilities and subjecting her to abusive treatment in the workplace, interfering with her claims for worker's compensation benefits, demoting her from her Senior Government Information Specialist position and placing her in positions that were less suitable for her given her medical limitations, Defendant has engaged in unlawful employment discrimination against Plaintiff based upon her disabilities.

30.      As a result of this unlawful discrimination, Ms. Taylor Lynch has suffered and continues to suffer adverse consequences, including loss of pay and benefits of such employment, career damage, personal and professional embarrassment and humiliation, both

-13-

delayed healing and an exacerbation of her medical condition, physical and emotional pain and suffering, and a loss of the enjoyment of life.

**Count IV.**     **Discrimination Based Upon Disability.**

31.     By refusing to allow Plaintiff light duty as directed by her treating physician, imposing requirements known to be contrary to the recommendations of her treating physicians, and placing Plaintiff in positions which were not suitable for her given her medical limitations, Defendant has engaged in unlawful employment discrimination against Plaintiff by failing to accommodate her known disabilities.

32.     As a result of this unlawful discrimination, Plaintiff has suffered and continues to suffer adverse consequences, including loss of pay and benefits resulting from the deterioration of her medical condition and her being forced to accept workers compensation benefits rather than her usual GS-14 pay, career damage, personal and professional embarrassment and humiliation, both delayed healing and an exacerbation of her medical condition, physical and emotional pain and suffering, and a loss of the enjoyment of life.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment in her favor and against Defendant on her claims of unlawful discrimination and retaliation, and provide her with the following relief:

(a)     award Plaintiff compensatory damages against Defendant in the amount of $300,000.00, plus interest thereon;

(b)     order Defendant to immediately return Plaintiff to her position as the ETA FOIA Coordinator or a comparable position with all necessary reasonable accommodation including the opportunity to telework;

-14-

(c)     award Plaintiff full back pay (less appropriate offsets), with interest thereon;

(d)     enjoin Defendant from further discriminating or retaliating against Plaintiff;

(e)     award Plaintiff the costs of bringing and maintaining this civil action and the

       administrative charges that preceded it, including reasonable attorneys' fees; and

(f)     award Plaintiff such other and further relief as the interests of justice may require.


### JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues of fact, including the measure of
damages.


Respectfully submitted,

Richard L. Swick
D.C. Bar No. 936930
SWICK & SHAPIRO, P.C.
1101 15th Street, N.W.
Suite 205
Washington, DC 20005
Tel (202) 842-0300
Fax (202) 842-1418
Email - rlswick@swickandshapiro.com

Attorney for Plaintiff